**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**KEITH BLEVINS,**

**Plaintiff,**

**v.** **Case No.: 2:15-cv-06244**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

**Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration *(*hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 10, 11).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand of

the Commissioner's decision, (ECF No. 10); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I. Procedural History

On July 15, 2011, Plaintiff Keith Blevins ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of March 21, 2011, (Tr. at 274-78), due to "back problems, emphysema, hole in right lung, bruised heart, three broken ribs, pelvis broke [*sic*] in four places, right knuckle dislocated, broken right foot, dislocation of toe on right foot, [and] hernia." (Tr. at 301). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 36). Claimant filed a request for an administrative hearing, which was held on December 27, 2012 before the Honorable Stanley Petraschuk, Administrative Law Judge ("ALJ"). (Tr. at 55-90). The ALJ held a supplemental hearing on November 26, 2013 in order to obtain additional medical source and vocational expert opinions. (Tr. at 92-107). By written decision dated January 3, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 36-48). The ALJ's decision became the final decision of the Commissioner on February 18, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 6-12).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Motion for Judgment on the Pleadings and a memorandum in support of that motion. (ECF Nos. 10). In response, the Commissioner filed a Brief in Support of

Defendant's Decision, (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II. Claimant's Background

Claimant was 41 years old at the time of the alleged onset of disability, and 44 years old at the time of the ALJ's decision. (Tr. at 60). He has an eleventh grade education and primarily communicates in English. After leaving school, Claimant obtained a General Equivalency Diploma. (Tr. at 61). He previously worked as a forklift operator, warehouseman, automobile detailer, security guard, sheet metal installer, and machine operator in a grain processing plant. (Tr. at 309-14).

## III. Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is

whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§

404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured

status for disability insurance benefits through June 30, 2011. (Tr. at 38, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since March 21, 2011, the alleged disability onset date. (Tr. at 38, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "pain disorder, status post motorcycle accident with multiple fractures; chronic obstructive pulmonary disease (COPD); hernia; and degenerative disc disease of the thoracic and lumbar spine." (Tr. at 38-41, Finding No. 3).

The ALJ also considered various physical ailments reflected in Claimant's medical records, but determined that they were non-severe, because they either did not persist for twelve consecutive months, or they were chronic in nature and well-controlled, producing insignificant symptoms. (Tr. at 39). In addition, the ALJ assessed Claimant's psychological complaints, noting that although Claimant had not received mental health treatment, he testified at the administrative hearing that he had felt depressed since having a serious motorcycle accident in March 2011, which was followed by the death of his father four days later. The ALJ reviewed findings from a psychiatric consultative examination and concluded that Claimant had the medically determinable mental impairment of depression. (*Id*.). Therefore, the ALJ examined Claimant's limitations in four broad functional categories and found that Claimant was mildly limited in activities of daily living, social functioning, concentration, persistence, and pace, and had no episodes of decompensation of extended duration. (Tr. at 39-40). Consequently, Claimant's mental impairment was assessed as non-severe.

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments

contained in the Listing. (Tr. at 42, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can occasionally climb, crouch, and crawl; he can frequently balance, stoop, and kneel. He must avoid all exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as unprotected heights and moving machinery. Additionally, the claimant is able to understand, remember and carry out no more than simple instructions.

(Tr. at 42-46, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any of his past relevant work. (Tr. at 46, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 46-47, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1969, and was defined as a younger individual age 18-44 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 46, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a night cleaner, hand packer, or merchandise marker at the light exertional level and document preparer, food sorter, and folder at the sedentary exertional level. (Tr. at 46-47, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 48, Finding No. 11).

## IV. Claimant's Challenges to the Commissioner's Decision

Claimant raises two broad challenges to the Commissioner's decision.[1] (ECF No. 10 at 9-16). First, he asserts that the ALJ failed to perform a proper credibility analysis, which resulted in the ALJ improperly discounting the effects of Claimant's pain disorder. According to Claimant, the ALJ focused almost exclusively on the objective medical evidence, ignoring other significant factors essential to a proper assessment of the severity, persistence, and limiting effects of his symptoms. (*Id*. at 11-13). Moreover, despite acknowledging his obligation to provide clear and specific reasons for the credibility determination, the ALJ did nothing more than summarize the medical records and briefly analyze opinion evidence. Claimant contends that the ALJ's discussion is grossly inadequate. Rather than providing a legitimate explanation for discounting Claimant's credibility, the ALJ supplied nothing more than superficial commentary.

Second, Claimant argues that the ALJ's findings at step two of the process and his RFC finding were erroneous, because they failed to account for the limitations associated with Claimant's depression. (Id. at 13-16). Claimant asserts that the problem began with the ALJ's mishandling of the opinions provided by psychological experts. Claimant indicates that the ALJ gave great weight to all of the mental health opinions, but failed to appreciate that the opinions were not consistent given that some of the mental health experts found Claimant to have more severe psychological limitations than others. Nevertheless, the ALJ simply glossed over the contradictions and concluded that Claimant's mental impairments were non-severe. In Claimant's view, the ALJ never

---

[1] The undersigned notes that Claimant's brief contains citations to page numbers in the Transcript of Proceedings that do not correspond to the page numbers in the transcript available to the Court. For sake of clarity, the transcript citations in this PF&R refer to the black numbers located at the bottom right corner of each page beginning on ECF No. 9-2 at 2 and ending on ECF No. 9-21 at 3.

resolved the conflicts in the evidence, nor explained how and if he addressed the specific concerns raised by the experts. To provide another example of the ALJ's bungled treatment of Claimant's mental impairment, Claimant points out that the ALJ limited him to jobs requiring no more than simple instructions, yet never explained the basis for that limitation. Claimant argues that this limitation was obviously intended to address a mental functional limitation. However, without a clear and reasonable explanation of how the ALJ arrived at that particular limitation, the RFC finding is meaningless. Claimant maintains that the evidence does not support such a limitation; consequently, the RFC finding is not supported by substantial evidence.

In response, the Commissioner supports the credibility analysis, maintaining that the ALJ followed the two-step process required by Social Security regulations. The Commissioner argues that the ALJ reviewed the medical evidence and found that Claimant's conditions could cause pain, but correctly discounted Claimant's descriptions regarding the severity and limiting effects of the pain based upon the evidence as a whole. (ECF No. 11 at 12-14). In addition, the Commissioner highlights inconsistent statements made by Claimant, which the ALJ emphasized during his credibility discussion. Although the ALJ did not expressly address every factor that was considered in evaluating Claimant's credibility, the Commissioner asserts that the ALJ is not required to do so. As long as the explanation conveys the primary reasons for discounting Claimant's credibility, then the ALJ has complied with the pertinent requirements. The Commissioner contends that the ALJ fulfilled his duty in assessing Claimant's credibility and explaining his conclusions.

With respect to Claimant's second challenge, the Commissioner disagrees with Claimant's view of the ALJ's written opinion. The Commissioner argues that the ALJ is

permitted to give a medical source opinion great weight and still not accept every aspect of the opinion. In this case, the ALJ generally agreed with the experts that Claimant had the medically determinable impairment of depression. However, while some of the experts felt Claimant had mild limitations and others thought Claimant had mild to moderate limitations, the ALJ plainly concluded that Claimant's limitations were mild rather than moderate. According to the Commissioner, the medical source opinions were not contradictory; they just varied slightly, and only in degree. The Commissioner also claims that other significant evidence in the record supports the ALJ's finding of a non-severe mental impairment. For example, Claimant did not receive any mental health treatment, took no medication for depression, and produced no evidence to suggest that depression limited his ability to do work-related activities.

## V. Relevant Medical Evidence

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

On March 21, 2011, Claimant was transported by HealthNet Aeromedical to Charleston Area Medical Center ("CAMC") after he pulled out in front of an automobile while he was driving a motorcycle. (Tr. at 385). Claimant was resuscitated and assessed in the Emergency Department. (Tr. at 386). He was transferred to the intensive care unit under the care of the trauma service. Claimant's preliminary injury list included a concussion, right ankle injury, bilateral pubic rami fractures, left rib fractures, and abrasions of the upper and lower extremities bilaterally. (Tr. at 388). On March 31, 2011, Claimant was seen in consultation by Dr. Ken Wright, a medical rehabilitation specialist.

(Tr. at 431-32). Dr. Wright documented that Claimant was participating in physical and occupational therapy and was currently nonweightbearing on the right lower extremity and weightbearing on the left lower extremity. He was improving with therapy. Claimant denied any focal motor or sensory deficits and also denied any memory problems. (Tr. at 431). His upper extremities had a normal range of motion and strength. Dr. Wright did not feel that Claimant need inpatient rehabilitation and opined that he could go home in a few days with home health therapies to improve weightbearing. (Tr. at 432). Claimant was discharged from CAMC on April 1, 2011 with various instructions, medications, and follow-up appointments. (Tr. at 422-23). He was scheduled to see Dr. James Maurer, an orthopedic specialist, in one week, and the surgery service in two weeks. In addition, he was told to see a medical doctor of his choosing for treatment of a hiatal hernia. (Tr. at 423).

On April 27, 2011, Claimant presented to Dr. Maurer's office and saw both Dr. Maurer and his Physician's Assistant, Phillip Reustle. (Tr. at 440-41). Claimant reported that he was doing well overall, but had complaints of pain. He had no past medical, surgical, social, or family history, except that he used tobacco. Claimant had no allergies and took no medications. (Tr. at 440). A review of systems yielded no positive results. Claimant's physical examination was essentially normal. X-rays of his fractures showed that they were non-displaced. Dr. Maurer put Claimant in a Cam boot for his right lower extremity and gave him a prescription for four weeks of physical therapy, three times per week. (Tr. at 441). Claimant was instructed not to bear weight on the right leg for twelve weeks and he was given a prescription of Lortab, 60 tablets, with no refills. (*Id*.).

Claimant returned to Dr. Maurer's office for follow-up on May 24, 2011. (Tr. at 438). He complained of some mild pain, but had no acute changes and was generally

doing well. His examination revealed some swelling of the right foot. He was told to continue with his exercises. (*Id*.). On his next visit at Dr. Maurer's office, Claimant complained of occasional pain and swelling, but was generally doing well. (Tr. at 436). Examination of the extremities showed some swelling of the right foot, but range of motion had improved. Claimant was instructed to begin weightbearing as tolerated and to wean himself from crutches. He was approximately twelve weeks post-accident, so Dr. Maurer placed him on over-the-counter pain medication, recommended that he continue exercises, and use ice and elevation for swelling. (*Id*.).

Claimant presented to the Boone Memorial Hospital Clinic ("BMHC") on July 14, 2011 and saw Advanced Practice Nurse Blitz Turner. (Tr. at 529-31). Claimant complained of a knot on his left hip that caused moderate sharp and stabbing pain, which worsened with movement and when lying down. (Tr. at 529). He also complained of swelling in his right foot and ankle, with aching, burning, and stinging, which had been present off and on for four months. The foot and ankle problems gradually increased throughout the day and were exacerbated by walking, standing, and exertion. (*Id*.). Nurse Turner examined Claimant and believed the knot was a sebaceous cyst. (Tr. at 530-31).

Claimant returned to the BMHC on July 22, 2011 for follow-up with Dr. Jennifer Hensley. (Tr. at 532-34). He provided her with information regarding his motorcycle accident, reporting that he continued to have right foot swelling and discoloration. (Tr. at 532). Claimant also admitted to having low back pain and pain in the extremities, but denied other complaints, including anxiety, depression, agitation, and sleeplessness. (Tr. at 533). On examination, Claimant appeared in moderate pain with a discolored right foot. Dr. Hensley prescribed Motrin, Lortab, Flexeril, Neurontin, and Mobic. (Tr. at 534). She counseled Claimant about narcotic abuse and addiction and encouraged him to eat

high protein foods in view of his weight loss.

On August 23, 2011, Claimant saw Dr. Hensley in follow-up at the BMHC. (Tr. at 535-37). He reported persistent pain and lack of sleep, stating that the pain was in his back and pelvis. He described the pain as constant, radiating, and sharp. (Tr. at 535). In addition, Claimant had swelling and pain in the lower extremities. On examination, Dr. Hensley observed Claimant to be in severe pain. He walked with a cane, and his gait was unsteady. (Tr. at 536). Claimant's sacrum appeared deformed, and he had muscle loss in the right lower extremity. Claimant admitted taking Roxicodone a few days earlier in an effort to relieve his uncontrolled pain. Dr. Hensley prescribed Ultram, Lortab, Neurontin, and Percocet. She counseled Claimant again regarding compliance with medications and cautioned him about the dangers of using street drugs. She referred him to physical therapy for a consultation regarding his low back pain. (Tr. at 537). By his next visit on September 22, 2011, Claimant was having some improvement in symptoms, although they were still present. (Tr. at 538-39). His gait was antalgic, and he appeared in moderate pain. In addition, Dr. Hensley noted increased weakness of the right leg with atrophy present. (Tr. at 539). She prescribed Flexeril, Mobic, Neurontin, and Percocet.

On January 3, 2012, Claimant returned to the BMHC and saw Dr. Hensley. (Tr. at 501-02). He reported that he had fallen three weeks earlier, caught himself, and had felt severe pelvic pain ever since. The pain was constant, radiating, and sharp, and was also in his back. Claimant complained that the pain interfered with his sleep. Dr. Hensley noted that Claimant was walking with a cane. (Tr. at 502). On physical examination, Dr. Hensley felt a bony deformity on Claimant's sacrum, with tenderness in the pelvis and sacrum; there was atrophy of the quads and hamstrings bilaterally; and weakness of the lower extremities. Dr. Hensley assessed Claimant with thoracic disc degeneration,

chronic pain due to trauma, and lumbago. She prescribed Neurontin, a DexPak, and Klonopin, and ordered medical imaging. (*Id*.).

On January 4, 2012, Jason Huffman, a physical therapist at Boone Memorial Hospital, prepared a discharge summary that detailed Claimant's progress in the physical therapy program ordered by Dr. Hensley in August 2011. (Tr. at 597). Mr. Huffman documented that Claimant's first visit occurred on September 6, 2011. At that time, his reported pain level was 7 on a 10-point pain scale. At Claimant's last visit, on December 2, 2011, his reported pain level was 6 out of 10, and he no longer needed an assistive device to ambulate. Nevertheless, Mr. Huffman indicated that Claimant had seen minimal improvement over the course of the physical therapy regimen due to his poor compliance and motivation. Mr. Huffman pointed out that Claimant had attended 19 sessions, but had missed 13 additional sessions. He had not returned as instructed for over one month. Consequently, Mr. Huffman was recommending discharge from physical therapy due to Claimant's lack of attendance. (*Id*.).

On January 12, 2012, Claimant underwent an MRI of the lumbar spine and sacrum at Boone Memorial Hospital. (Tr. at 503-04). The radiologist interpreted the images as showing "[m]ild degenerative findings with greatest neural impingement at L4-5 where there is eccentric disc bulge toward the right neural foramen with mild foraminal stenosis, but not high grade stenosis or nerve root impingement … [n]o herniated disc." (Tr. at 504). An MRI of Claimant's pelvis was performed on January 20, 2012, which showed no pathology present. (Tr. at 505).

On January 20, 2012, Claimant completed a health history form for St. Mary's Neurosurgery, LLC. (Tr. at 518-20). He described the injuries he received in the motorcycle accident and added that he had depression, ulcers, and acute pneumonia.

Claimant stated that he was unemployed due to the injuries he received in the accident. (Tr. at 519). Claimant reported having pain in his right foot, low back, hips, pelvis, left side, and bilateral calves. (Tr. at 521). He also indicated that he had tingling and numbness in his fingertips. Claimant saw Dr. Matthew Werthammer, a neurosurgeon, on January 30, 2012, and they reviewed Claimant's history and complaints. (Tr. at 522-23). Dr. Werthammer examined Claimant and found that his memory was intact; he followed complex commands briskly; his cranial nerves were grossly intact; his muscle bulk and tone were normal and his strength was 4+/5 in the upper and lower extremities; his sensory response was intact; straight leg-raising was negative; gait was slow; deep tendon reflexes were 2+/4 bilaterally, with toes downgoing. (Tr. at 522-23). Dr. Werthammer reviewed the MRI images of the lumbar spine taken earlier in the month, noting mild degenerative changes, "but nothing overly impressive to warrant consideration for any sort of surgical intervention." (Tr. at 523). He recommended conservative treatment and perhaps a referral to a pain clinic.

X-rays taken of Claimant's thoracic spine on February 28, 2011 showed multilevel disc space narrowing and osteophyte formation without acute fracture or subluxation. (Tr. at 511). In addition, a minimal chronic benign appearing wedge deformity of the upper thoracic vertebral body at the T4 was observed. (*Id*.).

On May 15, 2012, Claimant saw Dr. Hensley. (Tr. ay 498-500). He complained of worsening low back pain that was aching and sharp and lasted several hours. He indicated that the pain waxed and waned and occurred after exertion. Claimant also reported taking Klonopin for anxiety. (Tr. at 498). In addition to low back pain, Claimant stated that he had pain in the thoracic region and in his pelvis. (Tr. at 499). On physical examination, Dr. Hensley observed that Claimant's lumbar spine and sacrum were tender. She assessed

him with thoracic and lumbar disc degeneration and prescribed Neurontin, Percocet, a nonsteroidal anti-inflammatory medication, an antibiotic, and gave him an injection of Dexamethasone Sodium Phosphate. (Tr. at 499-500).

On December 4, 2012, Claimant requested an evaluation by Dr. Lo'Ay Al-Asadi, a pulmonologist, for symptoms of COPD and obstructive sleep apnea with excessive daytime somnolence. (Tr. at 548-49). Claimant reported having shortness of breath, occasional wheezing, a daily cough, reduced appetite, and an occasional upset stomach. In addition, Claimant snored loudly at night, and his snoring was associated with pauses and non-refreshing sleep. He admitted smoking 15 cigarettes a day for twenty years. His family history was positive for lung cancer, diabetes, hypertension, and coronary artery disease. Dr. Al-Asadi examined Claimant and performed pulmonary function studies. (*Id.*). He reviewed a CT scan of Claimant's chest taken in July 2012 that showed emphysematous changes. Dr. Al-Asadi concluded that Claimant had moderate emphysema secondary to smoking, as well as signs and symptoms of obstructive sleep apnea. (Tr. at 549). He recommended that Claimant quit smoking, advising him that he was at a high risk of lung cancer due to his family history and prolonged habit of smoking. He also gave Claimant a prescription for Spiriva and scheduled a sleep study to take place on December 28, 2012. Claimant did not show up for the sleep study. (Tr. at 568).

Claimant was admitted to Thomas Memorial Hospital on August 31, 2013 with a fever and progressive worsening shortness of breath. (Tr. at 609-10). He was diagnosed with several ailments, predominant of which were acute respiratory failure, acute exacerbation of COPD, pneumonia, and sepsis. Five days later, Claimant was discharged home on several medications. (Tr. at 610). On October 15, 2013, Claimant was seen in follow-up by Dr. Robby Keith of Pulmonary Associates of Charleston. (Tr. at 651-54).

Claimant reported feeling well. He denied having anxiety or depression, neurologic problems, joint pain, or muscle cramps. (Tr. at 652). On examination, Claimant appeared thin, but well developed. (Tr. at 653). His breathing was unlabored and his lungs were clear. Claimant's gait was documented as normal, and the strength and tone of his musculoskeletal system appeared normal on palpation. His extremities were neither swollen nor tender. Claimant's mood and affect were appropriate. (*Id.*). Dr. Keith diagnosed Claimant as having COPD and as being underweight. Dr. Keith instructed Claimant to gain ten pounds and advised Claimant's wife to stop smoking. He noted that Claimant quit smoking, but his wife continue to expose him to second-hand smoke. (Tr. at 654).

**B. Evaluations and Opinions**

On August 18, 2011, Lester Sargent, M.A., conducted a neuropsychological evaluation of Claimant at the request of the SSA. (Tr. at 443-49). The evaluation consisted of a clinical interview, mental status examination, review of records, and administration of the Wechsler Adult Intelligence Scale ("WAIS-IV") and the Neurobehavioral Cognitive Status Examination (""Cognistat"). Initially, Mr. Sargent recorded his observations of Claimant, noting that Claimant's posture was forward slumping, and he ambulated with the use of a cane, favoring his right leg. (Tr. at 443). Claimant was accompanied by his girlfriend of eleven years, who was disabled. (Tr. at 444).

Claimant stated that he was applying for disability benefits due to injuries he received in a motorcycle accident in March 2011. Although he blamed the accident for preventing him from working, he admitted that he was last employed three years before the accident, in 2008. In regard to presenting symptoms, Claimant reported that he had a history of depression, which began in 1996 following the death of his child in a car

accident. Claimant revealed that he was driving the vehicle at the time of the accident. (*Id*.). The depression was exacerbated after Claimant's 2011 motorcycle accident and was associated with a loss of interest in activities, unsatisfying sleep, pessimism, feelings of worthlessness, guilt, and crying episodes. Claimant was also experiencing chronic pain, which interfered with his ability to function and caused him frustration. Claimant complained of short-term memory loss secondary to his concussion. He indicated that his psychological symptoms were treated with medication prescribed by his family physician.

On mental status examination, Claimant was adequately groomed and cooperative with fair eye contact. (Tr. at 447). His speech was coherent and connected, and he was oriented in all spheres. His mood was observed to be depressed, and his affect was restricted. However, his thought processes, thought content, and perceptions were normal. (Tr. at 448). Mr. Sargent felt that Claimant's judgment was mildly deficient, and his psychomotor behavior was mildly retarded. Claimant's memory appeared normal, but his concentration, persistence, and pace were mildly impaired. (*Id*.). In addition, Mr. Sargent found Claimant's social functioning to be mildly deficient based upon observations of how Claimant interacted with others during the examination.

On the WAIS-IV, Claimant's cognitive ability was measured within the borderline range of intellectual functioning. His full scale IQ was 76. Mr. Sargent opined that the test results were reasonably valid based upon Claimant's effort and persistence during the examination. On the Cognistat, Claimant scored in the average range on every behavior except memory, which scored at low average. (Tr. at 447). Mr. Sargent again found the results to be valid for the same reasons that he gave in support of the IQ testing.

Mr. Sargent assessed Claimant with major depressive disorder, recurrent, moderate, without psychotic features; pain disorder, associated with both psychological

factors and a general medical condition; and borderline intellectual functioning. (Tr. at 448). Mr. Sargent believed that Claimant's prognosis was poor. Nevertheless, he felt Claimant was capable of managing his own funds. (Tr. at 449).

Jannifer Hill-Keyes, Ph.D., completed a Psychiatric Review Technique on August 26, 2011 at the request of the SSA. (Tr. at 453-67). Dr. Hill-Keyes determined that Claimant suffered from a non-severe organic disorder and affective disorder in the form of status post-concussion and major depressive disorder/pain disorder. (Tr. at 453-56). Dr. Hill-Keyes opined that Claimant's cognitive assessment by Mr. Sargent indicated "adequate mental capacity with mild limits likely consistent with premorbid educational level." (Tr. at 465). In addition, she felt that Claimant's "[s]ymptoms of depression do not impede daily functioning per [activities of daily living]" (*Id.*). Dr. Hill-Reyes did not agree with the poor prognosis supplied by Mr. Sargent, suggesting that Claimant was still adjusting to the aftermath of his motorcycle accident. She felt the prognosis was contrary to the other evidence, which demonstrated that Claimant was "doing well." Finally, Dr. Hill-Keyes found Claimant to be only partially credible based upon the medical evidence and the evaluation. (*Id.*). Dr. Hill-Keyes assessment was reviewed by Jeff Harlow, Ph.D., on January 10, 2012. (Tr. at 491). Dr. Harlow noted that Claimant had received no mental health treatment since Dr. Hill-Keyes's review. Dr. Harlow affirmed Dr. Hill-Keyes's assessment as written. (*Id.*).

On November 8, 2011, agency consultant, Rabah Boukhemis, M.D. completed a Physical Residual Functional Capacity Assessment form. (Tr. at 477-85). Dr. Boukemis opined that Claimant could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit (with normal breaks) for a total of 6 hours in an 8-hour workday, and had

unlimited ability to push/pull. (Tr. at 478). Claimant could frequently balance, stoop, or kneel; but could only occasionally climb, crouch, or crawl. (Tr. at 479). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 480-81). Regarding environmental limitations, Dr. Boukhemis opined that Claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and irritants such as fumes, odors, dusts, gases, poor ventilation, and to hazards such as machinery and heights; but that he could sustain unlimited exposure to noise. (Tr. at 481). Dr. Boukhemis found Claimant to be only partially credible, although he did not explain the basis for that opinion. Dr. Boukhemis's assessment was reviewed by Dr. Amy Wirts in light of additional medical information supplied by Claimant. On January 12, 2012, Dr. Wirts affirmed Dr. Boukhemis's assessment as written. (Tr. at 493).

At the conclusion of the first administrative hearing, Claimant's counsel asked the ALJ to send Claimant's case file to medical experts for review and to answer special interrogatories concerning the severity of his impairments. (Tr. at 89-90). The ALJ agreed to consider the request and ultimately obliged counsel by consulting with two experts, Dr. Judith Brendemuehl and Dr. John Linton. On February 27, 2013, Judith Brendemuehl, M.D., a general surgeon, completed a review of Claimant's records and responded to nine interrogatories. (Tr. at 551-57). Dr. Brendemuehl confirmed that she had considered all of the evidence supplied to her; had not examined the Claimant, nor discussed the case with anyone; and had sufficient objective evidence to form opinions regarding the nature and severity of Claimant's impairments during the relevant period. (Tr. at 551). Dr. Brendemuehl found that Claimant had four severe impairments, including degenerative disc disease of the lumbar spine with no disc herniation or high grade stenosis; moderate COPD; possible obstructive sleep apnea; and status post-motorcycle accident with healed

fractures. (Tr. at 551, 553). Dr. Brendemuehl noted that Claimant's assertions of cardiac and pulmonary trauma from the accident were not substantiated in the record, and he showed no long-term limitations related to any alleged trauma. (Tr. at 553). Dr. Brendemuehl did not believe that Claimant's impairments met any listed impairment. She considered Listing 1.04A, but saw no radicular findings or complaints, and Listing 3.02A, but indicated that Claimant's pulmonary function studies were not severe enough to meet listing level. (Tr. at 555). Lastly, Dr. Brendemuehl was asked to identify any functional limitations or restrictions resulting from Claimant's impairments, specifying the evidence supporting the existence of the limitation. (Tr. at 556). Dr. Brendemuehl opined that Claimant could perform light exertional work with some environmental restrictions related to his COPD. She recommended that he avoid exposure to extreme temperatures, humidity, and concentrated pulmonary irritants. She explained that Claimant's exertional level was not reduced below light, because he had normal muscle bulk and tone, negative straight leg-raising tests, normal deep tendon reflexes and sensory examinations, and a slow, but not assisted or limping gait. (*Id*.). She felt that any injuries Claimant received in the motorcycle accident should have resolved within six months.

On May 13, 2013, John C. Linton, Ph.D., a clinical psychologist, completed his review of the evidence, prepared a report, and answered nine interrogatories pertaining to Claimant's mental impairments. (Tr. at 558-64). In his report, Dr. Linton confirmed that he had reviewed all of the records provided to him. He noted that only one record had psychological significance; that being, the agency evaluation completed in August 2011 by Lester Sargent, M.A. (Tr. at 558). Dr. Linton commented that Mr. Sargent found Claimant to suffer from moderate major depression that was not disabling; to have low

average to borderline intellectual functioning; and to have no serious difficulties with attention, concentration, and memory. Although Dr. Linton acknowledged that he was not asked to evaluate Claimant's credibility, he pointed out what he thought was a discrepancy in Claimant's reports, indicating that Claimant repeatedly denied a history of substance abuse although the records demonstrated otherwise. Dr. Linton further emphasized that while Mr. Sargent found Claimant to be depressed, no treating provider made a similar finding, and Claimant was not taking any antidepressant medication. Claimant was prescribed Klonopin, a medication used to treat anxiety, beginning in 2012, but Dr. Linton could find no records reporting any psychological diagnoses. He agreed that Claimant suffered from pain symptoms, but felt that Claimant's depression and intellectual functioning would impose only a slight limitation on his ability to concentrate on complex tasks over time, "but would not in and of themselves render him unable to function in the workforce." (Tr. at 559).

With respect to the interrogatories, Dr. Linton confirmed that he was familiar with Social Security guidelines; had not discussed the case with anyone; had not examined Claimant; and found sufficient objective evidence in the record to provide opinions regarding the nature and severity of Claimant's mental impairments during the relevant time period. (Tr. at 560). He rated Claimant's limitations of activities of daily living to be mild to moderate; his difficulties in maintaining social functioning to moderate; his difficulties in maintaining concentration, persistence, or pace to be mild to moderate; and found that Claimant had no episodes of decompensation. (Tr. at 561). Dr. Linton did not believe Claimant met any listed impairment, and the evidence did not establish the presence of "paragraph C" criteria. (Tr. at 562-63). As far as identifying what Claimant could still do in a work setting, Dr. Linton wrote only, "avoid high stress fast paced work."

(Tr. at 564).

At the second administrative hearing held on November 26, 2013, Dr. Brendemuehl and Dr. Eugene Maleski, a psychological expert, testified in person. (Tr. at 93-101). Both experts agreed that Claimant did not meet any listed impairment. Dr. Brendemuehl reiterated the information contained in her interrogatory responses, confirming that her opinions had not changed. (Tr. at 95-98). Dr. Maleski testified that he had reviewed Claimant's records and found the diagnosis of major depression to be of questionable veracity. Dr. Maleski explained that the diagnosis was based primarily upon Claimant's self-report to Mr. Sargent, when, as Dr. Linton had pointed out, the remainder of the medical records showed no diagnosis or treatment for depression. Dr. Maleski indicated that Claimant's intellectual functioning, based upon the WAIS-IV, was at the upper end of borderline, which might have some impact on his performance, and Dr. Maleski questioned whether Claimant had opioid dependence. (Tr. at 99). In regard to Claimant functioning in the four broad categories, Dr. Maleski opined that Claimant had mild impairment in his activities of daily living and social functioning, and may have some mild impairment in persistence, pace, and concentration. He had no episodes of decompensation. (Tr. at 100). When asked by Claimant's counsel if he agreed that Dr. Linton's ratings appeared to be more in the moderate range of severity, Dr. Maleski stated: "It's ... compared to the rest of the record, I would tend more to say it probably varies somewhat between mild and moderate." (Tr. at 101).

## VI. Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v.*

*Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. Discussion

Claimant finds fault with the ALJ's credibility assessment and with his evaluation of Claimant's depression as non-severe. Having carefully reviewed the record and the ALJ's written decision, the undersigned **FINDS** that the written decision is significantly flawed, requiring that this case be remanded for further proceedings. In particular, on remand, the ALJ should (1) provide an adequate explanation for his credibility finding that would allow the court to conduct a meaningful review; and (2) address all of Claimant's mental impairments, explaining if, how, and why they are accounted for Claimant's RFC finding.

### A. The ALJ's Credibility Analysis

In his first challenge to the Commissioner's decision, Claimant asserts that the ALJ

erred when he found that Claimant's report of his symptoms was less than fully credible. (ECF No. 10 at 11-13). Under the Social Security rulings and regulations, an ALJ is obligated to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statement about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could reasonably be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating the credibility of a claimant's statements, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained

from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). Thus, while the ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations, the lack of objective medical evidence is one factor that may be considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the individual and

may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determination is supported by substantial evidence, the Court will not replace its own credibility assessment for that of the ALJ; rather, the Court must scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ plainly understood that he was required to follow the two-step process. (Tr. at 42). The ALJ provided a thorough summary of the clinical, medical imaging, laboratory, and other diagnostic data. He also supplied a comprehensive discussion of Claimant's statements regarding his symptoms, daily activities, limitations,

and capabilities. (Tr. at 39-41). As required by the process, the ALJ made an assessment that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. Furthermore, the ALJ found that Claimant's statements regarding the limiting effects of his symptoms were not entirely credible. (Tr. at 43). However, the undersigned cannot find that the ALJ's credibility determination is supported by substantial evidence, because the reasons for the determination were never articulated by the ALJ. In the absence of an explanation for the credibility finding, the Court is precluded from conducting a meaningful review. Therefore, the matter must be remanded for further proceedings. *See Mascio v. Colvin*, 780 F.3d 632, 640 (4th Cir. 2015).

The ALJ indicated that Claimant was not entirely credible "for the reasons explained in this decision." (Tr. at 43). However, the only statement touching on Claimant's credibility is found earlier in the written decision and pertains to an observation by psychology consultant, Dr. Linton, that Claimant had denied a history of substance abuse despite record evidence to the contrary. (Tr. at 40). Since Dr. Linton made that comment in relation to the severity of Claimant's depression, and not in regard to the intensity of his physical pain, it is not clear that the ALJ even had that comment in mind as a "reason" for discounting the reliability of Claimant's statements regarding the limiting effects of his pain.

After promising to provide reasons for discounting Claimant's credibility, the ALJ simply failed to do so. Instead, he discussed Claimant's history of low back symptoms that preceded the onset of Claimant's alleged disability. (Tr. at 43). The ALJ then reviewed the motorcycle accident that left Claimant with bilateral superior and inferior pubis rami fractures, a sacral fracture, a concussion, a navicular fracture, rib fractures, and multiple

toe and finger fractures. The ALJ followed this paragraph with a summary of other aspects of the medical evidence, some of which corroborated Claimant's complaints of severe pain and some of which undermined the allegations. However, the ALJ never made a connection between any piece of evidence and any of Claimant's statements, nor provided an explanation of why or how the particular evidence was significant to an analysis of Claimant's credibility. The ALJ also addressed the testimony of Dr. Brendemuehl, who stated that Claimant's fractures were healed within eleven weeks after the motorcycle accident, and the opinion of non-examining consultant, Dr. Boukhemis, who limited Claimant to light exertional level work; however, once again, the ALJ failed to correlate these opinions in any way to the truthfulness of Claimant's descriptions of pain. If the ALJ meant to communicate that healed fractures cause no pain, he never completed that thought. Moreover, the ALJ never discussed Claimant's psychological diagnosis of pain disorder, which Mr. Sargent assessed based upon Claimant's report of "significant disruptions in social, occupational, and other areas of functioning secondary to chronic pain." (Tr. at 449). While the record may contain a myriad of reasons for discounting that diagnosis and Claimant's self-reports of chronic, disabling pain, the ALJ is responsible for weighing the evidence, reconciling the inconsistencies, and explaining the rationale of his reconciliation, as well as the specific evidence that informs it. The explanation need not be exhaustive, but it must appear in the decision.

Lastly, the ALJ wrote: "In sum, the above residual functional capacity assessment is supported by the claimant's testimony and written statements in connection with the clinical facts, medical findings, and opinions of treating, examining, and non-examining physicians." (Tr. at 46). This statement is confusing at best; particularly, as the ALJ has not pointed to any statements by Claimant that support the RFC finding, nor has he

identified any particular statements that he finds not to be credible. At the administrative hearing, Claimant testified that he cannot move well, cannot squat, cannot lift much, cannot drive, uses a cane to walk, has intolerable back pain, can stand only 5 to 10 minutes at a time, cannot bend, cannot carry more than 5 pounds, cannot push and pull with his right hand, cannot push and pull with his feet, cannot climb stairs, and cannot stoop. He is unable to do any household chores or yardwork and spends most of the day watching television and sleeping on the couch with his legs elevated so his feet do not swell. He takes medicine that makes him drowsy and his sleep is disturbed. (Tr. at 70-83). This testimony was generally consistent with Claimant's pain questionnaires. (Tr. at 316-28, 337-49). In a January 2012 form Claimant completed for Dr. Werthammer, he described diffuse pain in the low back, pelvic girdle, hips, calves, and right foot that was associated with weakness, as well as swollen feet, and leg pain when walking. (Tr. at 519-521). Clearly, Claimant's statements do not, in any way, support the RFC finding.

The Commissioner contends that the ALJ performed an adequate credibility analysis, highlighting certain portions of the medical evidence discussed by the ALJ, and explaining the ALJ's purpose in including those particular references. The problem with the Commissioner's position is that while the ALJ transcribes specific medical notes and findings into his decision, he fails to provide any insight into their relevance. Thus, the Commissioner, or the Court, is left to surmise how the ALJ believed that particular document, finding, or note was significant. Moreover, the ALJ's discussion included many notations that seemed to corroborate Claimant's allegations. For example, in August 2011, Claimant had a sacral deformity, muscle loss in the right lower extremity, and an unsteady gait. He complained that he was unable to sleep due to pain. By September 2011, he had muscle atrophy. (Tr. at 44). He participated in physical therapy through December 2011

for symptoms of low back pain and radiculopathy, but experienced an increase in pain and a decrease in mobility. (*Id*.). Claimant suffered a fall in January 2012 and was in severe pain, using a cane to walk. When examined by a neurosurgeon, he complained of diffuse pain and tenderness at the sites of his prior fractures, low back pain, and weakness, and he walked with a slow gait. (Tr. at 44). In November 2012, he complained that even Percocet provided inadequate pain control. (*Id*.). The ALJ never explained the purpose of including these records in his discussion of credibility and RFC, nor did he reconcile them with his credibility determination.

Thus, although the ALJ's credibility determination may ultimately be proven correct, the written decision simply does not provide the Court with a sufficient basis to allow a meaningful review. An explanation that is '"devoid of reasoning'" ... [renders] impossible the task of determining whether the ALJ's finding was supported by substantial evidence." *Brown v. Colvin*, No. 14-2106 (4th Cir. Feb. 9, 2016) (unpublished) (quoting *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Because pain plays an important role in the RFC assessment, if the Court is unable to validate the credibility analysis, then it must also question the accuracy of the RFC assessment. Accordingly, the undersigned **FINDS** that the ALJ's explanation of the credibility finding is inadequate and requires remand for further proceedings.

**B. Mental Impairment**

Claimant next asserts that the ALJ erred in assessing the severity of Claimant's mental impairment of depression. The ALJ determined that Claimant's depression was a non-severe impairment, because it caused only mild limitations in the first three functional areas and no episodes of decompensation. In reaching this conclusion, the ALJ relied in large part on the opinions of the consulting psychologists. However, Claimant

contends that the ALJ obviously misunderstood the opinions, because he gave all of them great or significant weight, even though they were not consistent with each other, or with his severity finding. (ECF No. 10 at 13-15). Claimant argues that by failing to appreciate the severity of Claimant's mental impairment at step two of the disability evaluation, the ALJ introduced error into the process that was carried forward and was never corrected. Consequently, the RFC finding and inquiries to the vocational expert did not adequately represent the mental functional limitations suffered by Claimant. In further support of his position, Claimant contends that the limitation to "simple instructions" included in the RFC finding, while apparently designed to account for Claimant's mental impairment, has no basis in the evidence, nor clear rationale expressed in the written decision. (*Id*. at 15).

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). The claimant bears the burden of proving that an impairment is severe, *Grant*

*v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, at step two, the ALJ considered whether Claimant suffered from any medically determinable mental impairment. (Tr. at 39-41). The ALJ noted that Claimant had no mental health care treatment records in the file, but had undergone a consultative evaluation by a psychologist, Mr. Lester Sargent, on August 15, 2011. (Tr. at 39). Mr. Sargent diagnosed Claimant with major depressive disorder without psychotic features and pain disorder associated with both psychological factors and a general medical condition. In light of these diagnoses, the ALJ proceeded to assess the severity of Claimant's medically determinable impairment of depression, using the four broad

functional areas set out in the disability regulations. Examining Claimant's reports, testimony, and statements to Mr. Sargent, the ALJ concluded that Claimant had mild limitations in the first three categories and no episodes of decompensation. The ALJ then discussed the expert opinions. He reviewed a letter written by Dr. Linton in which Dr. Linton acknowledged that Claimant had a history of depression, but had no disabling symptoms or limitations. Moreover, Dr. Linton felt Claimant had been able to work and pursue appropriate activities of daily living. (Tr. at 40). The ALJ addressed Dr. Linton's opinions that Claimant had mild to moderate limitations in activities of daily living, and in maintaining concentration, persistence, and pace, and moderate limitations in social functioning. He gave Dr. Linton's opinions significant weight, but only to the extent they were consistent with his ultimate RFC findings. (Tr. at 41). So, contrary to Claimant's assertion, the ALJ did not accept Dr. Linton's opinions in their entirety.

The ALJ next discussed the opinions offered by Dr. Maleski during the administrative hearing. (*Id*.). The ALJ took note of Dr. Maleski's testimony that Claimant had no more than mild limitations in the first three areas of functioning. The ALJ afforded great weight to Dr. Maleski's opinions, finding them to be consistent with the rest of the evidence. The ALJ acknowledged the differences between Dr. Maleski's testimony and Dr. Linton's severity ratings;[2] however the ALJ made it clear that these differences did not

[2] In his brief, Claimant asserts that Dr. Maleski agreed with Dr. Linton's opinions, including his mild to moderate severity ratings. (ECF No. 10 at 14). However, the undersigned does not interpret Dr. Maleski's testimony in that manner. To begin, when Dr. Maleski testified that he agreed with Dr. Linton, Dr. Maleski was agreeing only with Dr. Linton's statement that Dr. Sargent's conclusion was not congruent with the rest of the evidence of record. (Tr. at 98-99). In addition, contrary to Claimant's contention, Dr. Maleski did *not* agree with Dr. Linton's severity ratings. Instead, Claimant's counsel asked Dr. Maleski if he agreed with the way counsel had assessed the meaning of Dr. Linton's checkmarks on a severity rating form. Specifically, Counsel suggested that the checkmarks meant "moderate" limitations, and asked Dr. Maleski if he agreed with that assessment of the form. Dr. Maleski stated that based upon the rest of Dr. Linton's record, Dr. Maleski believed Dr. Linton meant to convey a rating that varied between mild and moderate, although Dr. Maleski was not certain what circumstances would cause the variance. (Tr. at 100-101).

affect his confidence in Dr. Maleski's testimony. The ALJ concluded that, overall, the evidence demonstrated that Claimant's functional limitations from mental impairments were mild. Finally, the ALJ pointed to the Psychiatric Review Technique and Case Evaluation supplied by Dr. Hill-Keyes and Dr. Harlow, respectively, indicating that both documents supported the conclusion that Claimant's depression was non-severe. (*Id.*).

Reviewing the evidence, including the medical source statements, the undersigned **FINDS** that the ALJ did not err at step two of the disability evaluation by finding that Claimant's depression, standing alone, was a nonsevere impairment. As the ALJ emphasized, Claimant had no history of mental health treatment, and as demonstrated by his disability report, Claimant never alleged a severe or disabling mental impairment. (Tr. at 301). Furthermore, as Dr. Linton emphasized, although Claimant was diagnosed with depression in August 2011, he had suffered from situational depression in the past, which had not interfered with his ability to function appropriately. A mere five months before his diagnosis of depression, Claimant had suffered multiple fractures in a serious motorcycle accident and lost his father to cancer. Even still, he was not receiving anti-depressant medication or outpatient counseling. Claimant seldom complained of depression, and when directly asked, he generally denied feeling depressed. (Tr. at 524, 526, 529, 533, 535, 538, 541, 548, 603, 612, 614, 652). In addition, three psychologists agreed that Claimant's mental functional limitations were mild. While Dr. Linton rated Claimant's limitations as ranging from mild to moderate, he emphasized that Claimant's depression was "reactive" to his pain and altered lifestyle, and did not preclude him from participating in "limited but adequate self-care and socialization." (Tr. at 559). Moreover, Dr. Linton confirmed that Claimant's cognitive screening demonstrated no serious difficulties in attention, concentration, or memory. (Tr. at 558). Contrary to Claimant's

contention, the ALJ did not misunderstand the medical source opinions. He merely synthesized them and adopted the portions that he felt were most consistent with the evidence as a whole. In any event, the opinions were not inconsistent in that all of the psychologists providing RFC assessments felt that Claimant was capable of performing mental work-related activities on a sustained basis. Although Dr. Linton rated Claimant's mental limitations to be slightly more severe than Dr. Maleski, Dr. Hill-Keyes, and Dr. Harlow, the ALJ ultimately did his job by reconciling these differences and finding Claimant's limitations related to his depression to be mild overall.

Notwithstanding the ALJ's compliance with Social Security regulations in his assessment of Claimant's depression, the ALJ did err at step two of the sequential process by failing to address all of Claimant's medically determinable mental impairments. Indeed, the ALJ only considered Claimant's depression when assessing the severity of his mental conditions. The ALJ inexplicably eliminated from the discussion Dr. Sargent's other psychological diagnoses, including pain disorder and borderline intellectual functioning. While it is true that the ALJ included "pain disorder, status post motorcycle accident with multiple fractures" as a severe impairment, he never explained the meaning of that phrase. Consequently, the Court cannot know whether the ALJ meant the psychological disorder (identified by Mr. Sargent with diagnostic code 307.89 from the Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition), or whether the ALJ simply meant a cluster of physical symptoms associated with traumatic injury. The undersigned must presume the latter given that the ALJ's functional analysis did not support the existence of a severe mental impairment.

Equally puzzling, although the ALJ discussed the opinions of Dr. Linton and Dr. Hill-Keyes, he said nothing about their diagnostic findings related to pain disorder and

borderline intellectual functioning. For instance, Dr. Hill-Keyes agreed with the diagnosis of pain disorder, (Tr. at 456), but disagreed with Mr. Sargent's diagnosis of borderline intellectual functioning, instead opining that Claimant had an organic mental disorder of "status post-concussion" and had "adequate mental capacity with mild limits likely consistent with premorbid educational level." (Tr. at 454, 465). In contrast, Dr. Linton offered no explicit beliefs regarding Claimant's pain disorder, instead deferring to the "physician medical experts" to address that subject, but opined that Claimant's intellectual functioning might impose slight limitations on his ability to concentrate on complex tasks over time. (Tr. at 559). The ALJ never addressed, nor reconciled these diagnoses and opinions.

Although the ALJ erred by not conducting a thorough assessment of Claimant's mental impairments at step two of the process, that error may not require remand, because the sequential process proceeded to step three. The ALJ found that Claimant had severe impairments of pain disorder, COPD, hernia, and degenerative disc disease of the thoracic and lumbar spine. (Tr. at 38). Accordingly, the outcome at step two was the same; Claimant's applications for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list even a severe impairment at the second step of the process may not be reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin*, No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue*, No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process

and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W.Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."); A number of federal courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Accordingly, given that the process in this case continued to the third step, the remaining question is whether the ALJ appropriately considered the functional effects of Claimant's mental impairments during the later steps of the disability evaluation. Claimant contends that the ALJ did not, and in support of that position, points to the ALJ's RFC finding that Claimant was "able to understand, remember, and carry out no

more than simple instructions." (ECF No. 10 at 15; Tr. at 42). Claimant contends that the ALJ provided no explanation for how he reached this conclusion, and failed to identify any evidence that supported such a finding. (*Id*.).

The RFC finding contains one mental functional limitation; that being, that Claimant is restricted to jobs that require him "to understand, remember, and carry out no more than simple instructions." (Tr. at 42). The ALJ provided one sentence in the written decision to explain (presumably) this RFC finding. After assessing Claimant's limitations in the four broad functional categories, the ALJ stated: "[a]lthough the undersigned finds that the claimant's alleged mental health impairment of depression is non-severe, he noted some limitations when combined with significant physical symptoms, which have been incorporated into the below-defined residual functional capacity." (Tr. at 41). The undersigned agrees with Claimant that this sentence does not provide a useful explanation of the basis for the RFC finding and certainly does not substantiate that the ALJ has fully considered the functional effects of Claimant's mental impairments.

SSR 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id*. According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific

functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id*. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id*. at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id*. at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id*. Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id*.

In the instant action, the ALJ offers no rationale for including a limitation to simple

instructions, nor does he cite to any evidence supporting the restriction. If the limitation was intended to account for Claimant's borderline intellectual functioning, then the ALJ should have discussed that diagnosis, identified specific functional limitations related to it, and specified the evidence that connected Claimant's intellectual functioning to his ability to understand, remember, and carry out instructions. On the other hand, if the limitation was intended to address Claimant's complaints of having problems with concentration, focusing, and "persisting in things," (Tr. at 74), the ALJ should have explained why the RFC finding was necessary despite his conclusion that Claimant was only mildly limited in the functional area of concentration, persistence, and pace. (Tr. at 40). If as the Commissioner suggests, the restriction was included in response to Claimant's assertion that he had problems with instructions, the ALJ should have explained how a limitation to simple instructions would account for Claimant's self-reported deficiencies. Claimant stated in his first disability report that he had to read written instructions two or three times and hear spoken instructions two or three times before he understood them. (Tr. at 326). In his second report, he stated that he was unable to follow written instructions, but could follow spoken instructions. (Tr. at 347). Neither of these statements touched on the complexity of the instructions; rather, only the mode of delivery was addressed. Indeed, the complexity of the instructions may not have been an issue for Claimant based on the evidence. Claimant's treating physician, Dr. Werthammer, documented that Claimant was able to "[f]ollow complex commands briskly." (Tr. at 522). Furthermore, Claimant never alleged that his ability to follow instructions changed after the motorcycle accident. Considering that one of his prior jobs was categorized as semi-skilled and required him to use technical knowledge, operate equipment, and prepare reports, a limitation to simple instructions may not have been

properly included in the RFC finding. (Tr. at 314, 326, 347, 522).

In summary, the undersigned **FINDS** that the ALJ erred by failing to address Claimant's other mental impairments of pain disorder and borderline intellectual functioning at step two of the process and by failing to explain if and how he determined the nature and extent of the functional limitations associated with Claimant's mental impairments. The undersigned further **FINDS** that the ALJ's error requires remand, because the lack of any meaningful discussion of the mental impairments and their functional effects makes it impossible for the Court to determine if the RFC finding accurately represents Claimant's RFC.[3]

## VIII. Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's Motion for Judgment on the Pleadings, to the extent that it requests remand, (ECF No. 10); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

[3] The undersigned also notes that the ALJ's discussion under the first broad functional area at step two of the process makes little sense. (Tr. at 39-40). According to the ALJ, Claimant alleges that he is unable to do any household chores or yard work; has difficulty with personal care, because he cannot bend over, and cannot stand for long periods of time; he is unable to put on his pants due to his inability to bend; he has to sit when he shaves; he cannot make meals; he requires help getting in and out of the shower; and is unable to get into the bathtub. The ALJ adds that on August 15, 2011, Claimant told Mr. Sargent that he could perform basic self-care without assistance, but could not perform household chores. Without further explanation, and relying on these statements, which arguably describe significant restrictions in performing daily activities apart from "basic" self-care, the ALJ found Claimant to be only mildly limited in the functional area of activities of daily living.

hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** February 11, 2016

Cheryl A. Eifert
United States Magistrate Judge